**David A. FOSTER, Petitioner,**

v.

**A.L. LOCKHART, Director, Arkansas Department of Correction, Respondent.**

**No. PB–C–91–400.**

United States District Court,
E.D. Arkansas,
Pine Bluff Division.

Oct. 21, 1992.

Walter "Craig" Lambert, John Wesley Hall, Jr., P.C., Little Rock, AR, for petitioner.

Darnisa C. Evans Johnson, Asst. Atty. Gen., Little Rock, AR, for respondent.

## MEMORANDUM AND ORDER

FORSTER, United States Magistrate Judge.

Before the Court is the petitioner's petition for writ of habeas corpus.

## I. State Court Proceedings.

### A. Trial.

On October 17, 1986, petitioner was charged with rape. On March 31, 1987, he was tried before a Pulaski County Circuit Court jury. At trial, the forty-seven-year-old victim offered the following testimony on direct examination by the prosecutor: Between 4:00 and 5:00 a.m. on August 16, 1986, she heard a knock on her door at her home in Jacksonville, Arkansas, and went to the door and opened it. Petitioner was standing in the doorway, and he stated, "Is Vicki here? I thought you were Vicki. She's got my car, and she's not home with it." Petitioner then stepped inside the house into the living room, which was lit. The victim had previously seen petitioner a couple of times, specifically on August 15, 1986, late in the afternoon; at that time, he was driving a blue car. Tr. 106–110, 119. Petitioner was a friend of her daughter, Vicki. Petitioner and the victim then sat down on chairs in the living room; the chairs were about six or seven feet apart.

While they were talking about Vicki, petitioner jumped up, ran over to the victim, and ripped her blouse off. Tr. 110, 119. The victim started struggling with petitioner, and he removed her shorts and panties. Tr. 111. The victim managed to get away from petitioner and started toward her bedroom. Petitioner followed her. Tr. 112, 124. The victim decided that it was not wise to go into the bedroom, and instead ran out the front door and around to the side yard of the house. As she was trying to put her clothes on, petitioner came after her and knocked her down to the ground. Petitioner jumped on her, bit her neck so hard she "thought he was going to bite a plug out of it," and penetrated her vagina with his penis. The incident was "real short," lasting only a few minutes, and petitioner finished and left. Tr. 112–114. The victim gathered up her clothes and went back into the house and called her daughter, Darlene. Darlene arrived at the house and called the police, who arrived a short time later. The victim gave a description of her attacker to the police and identified him as "David." She also identified petitioner in a photographic lineup on August 22, 1986. She positively identified him at trial. Tr. 114–115, 120.

On cross-examination, the victim testified that she did not know if petitioner ran after her, but that he came after her. She stated that he left "real fast." She also testified that she did not notice that anything was wrong with the rapist's legs. Tr. 125–27.

Vicki, the victim's daughter, testified that petitioner was her friend in August of 1986, that she saw petitioner at her house on August 15, 1986, at about 3:00 or 4:00 p.m., that her mother was present on that date, and that her mother had previously met petitioner. Tr. 141–42.

Sergeant Carol Kimble testified that she investigated the rape and that she arrested petitioner on August 21, 1986. On cross-examination by defense counsel, Kimble testified that she noted on the arrest report that petitioner wore a leg brace. Tr. 162.

Dr. Ryland Mundie testified that he examined the victim at 8:30 a.m. on August 16, 1986, in the emergency room at University Hospital. Tr. 179–181. He found bruises on the right side of her neck and below her chin and a bruise on her chest below the collarbone. Tr. 183. A rape examination revealed the presence of sperm in her vagina, indicating fairly recent intercourse. There was no evidence that the intercourse was traumatic. Tr. 184. On cross-examination, he testified that the sperm in the vaginal vault was non-motile and that sperm are motile for up to forty-eight hours. Tr. 186.

Edward Vollman, a forensic serologist, testified that he was presented with the rape examination kit of the victim and that he conducted a test as to her blood type and blood group substance type. Tr. 190. Testing of vaginal slides revealed the presence of spermatozoa cells, and testing of vaginal swabs revealed the presence of semen and "A" and "H" blood group substances. Tr. 191–192. He also testified that petitioner's blood and saliva samples revealed that he belongs to blood group "A" and that he is a secretor of his blood group substance. Secretors are capable of depositing the blood group substance that correlates with their blood type in their saliva, urine, or semen. Tr. 190–191. He testified that the victim belongs to blood group "A" based upon tests of her blood and saliva samples and that she is a secretor. Tr. 192. Vollman also testified that forty (40) percent of the caucasian population belongs to blood group "A" and that eighty (80) percent of the population are secretors. Tr. 191–93. He stated that thirty-two (32) percent of the population belongs to blood group "A" and also are secretors of their blood group substance. Tr. 193. The following dialogue then occurred:

Prosecutor: So, the males in the population who would have blood group "A" and who would also be secretors, would you say it's fair to estimate that there are about half as many—50% women and 50% men in the world population?

Vollman: Correct.

Prosecutor: So, 16%, if you take half of 32, 16% of the people would belong to this blood group and would also be a

secretor of their blood group substance, is that correct?

Vollman: That would be the male input in the population.

Prosecutor: That would be the male?

Vollman: Yes.

Prosecutor: Based upon your education, and training and expertise in the field of serology, knowing what you know about the victim in this case and the samples that were presented from and the samples that were presented from David Foster, what does that 32% or the 16% of the male population indicate to you as to this case, Mr. Vollman?

Vollman: All I can say is that the "A" blood group substance was found from the vaginal swabs, and they had semen present. And, you know, it could come— The "A" blood group substance and the "H" blood group substance could have come from either the victim ..., or a suspect, David Foster. Anyone that belonged to blood group "A" and was a secretor.

Prosecutor: Anyone who belonged to blood group "A" and who was also a secretor, could they be excluded from identification as being the person who deposited this sperm in ... [the victim]?

Vollman: No.

On cross-examination by the defense, Vollman stated that there would be thousands of people in Pulaski County who are "A" secretors. Tr. 193–95.

Petitioner testified in his defense and stated that he suffered from partial paralyzation, that he wore a brace on his right leg all of the time, and that his injury is permanent. Tr. 200. He testified that he got around pretty well as far as walking "just a little ways." He stated that he could not run and that he could barely get up to a fast walk. Tr. 200. He testified that he drove over to Vicki's house at 3:00 p.m. on August 15, 1986, in his blue 1977 Monte Carlo and talked about what they were going to do that evening. Tr. 202. He left a short while later and went home. He stated that after he got home, he called Vicki, and after talking with her, he decided not to go out with her that evening. Tr.

203. He testified that around 6:00 p.m., he went to Brian Copeland's house and that they drove to Geyer Springs Road and stayed there until midnight. Tr. 204. He stated that he arrived home at 1:10 a.m., that he went to bed around 2:00 a.m., and that his mother, father, and brother (Darin) were at the house when he went to bed. Tr. 209–211. He stated that both he and Darin went to sleep near the television. Tr. 212. At around 2:25 a.m., petitioner was awakened by David Sowell, Tori Stewart, and Vanessa McDaniel, and he attempted to catch them in his car. He returned at about 2:30 a.m. and went to sleep. Tr. 214–15. At 3:30 a.m, the phone woke him up. Shortly thereafter, he fell asleep. Tr. 216. Petitioner testified that he woke up at 9:00 or 10:00 a.m. Tr. 216. He also testified that he did not go to the victim's residence that night or morning and that he did not rape or have sexual relations with the victim. Tr. 216–217. On cross-examination, he testified that the victim's residence was about seven or eight miles from his house. Tr. 219. He also testified that he was able to have sexual relations, but that he suffered from some "bad nerve damage" and it "took a lot" for him to get ready for sex. Tr. 225. He stated that he had never been in the house with the victim, but that he had talked to her. Tr. 227–28. He added that he had been convicted of felony theft of property. Tr. 224.

Brian Copeland, a friend of petitioner, testified that petitioner suffered from a physical disability and that his leg brace made him walk slowly. Tr. 230. Copeland, David Sowell, and Tori Stewart corroborated petitioner's version of what occurred on August 15, 1986. Tr. 230–46. Petitioner's father testified that petitioner was in the house asleep from 4:00 a.m. to 5:00 on August 16, 1986. Tr. 251. He also testified that petitioner got around fairly well on level ground, that he had not seen him run "in years," and that he had a limp. Tr. 252. Petitioner's mother corroborated this testimony. Tr. 262–71.

Kathleen Casey, a physical therapist, testified that as a result of petitioner's auto-

mobile accident in 1980, he was admitted to the Hot Springs Rehabilitation Center in 1982, where she worked. She stated that the admitting diagnosis was "cauda equina injury" in addition to severe injuries to the right lower leg, which included the severance of the heel cord on the right. She last treated petitioner in October of 1984. Casey stated that petitioner had not recovered from the heel cord severance, that his injury is permanent, that he walked with a limp, and that running would be possible, but difficult. Tr. 257–60, 272–274.

After the defense rested, the jury found petitioner guilty of rape, and he was sentenced to thirty-five (35) years imprisonment.

### B. Appellate Proceedings.

Petitioner appealed to the Arkansas Supreme Court and alleged that the trial court erred in denying his motion for new trial since the prosecuting attorney engaged in prejudicial conduct during the course of the trial. The Arkansas Supreme Court found that what little prejudice may have resulted from the prosecutor's statement was cured by the trial court's admonition to the jury. *Foster v. State*, 294 Ark. 146, 741 S.W.2d 251 (1987).

### C. Rule 37 Proceedings.

Subsequently, petitioner filed a petition with the Arkansas Supreme Court to proceed in circuit court pursuant to Ark. R.Crim.P. 37. He claimed that his attorney was ineffective for failing to seek a DNA test on the vaginal wash, panties, and blood from the alleged victim, and compare that with his blood and hair samples to prove that he was not the person who committed the rape. The Supreme Court found that petitioner failed to show that DNA testing was a widely recognized and available form of testing as of March 31, 1987, the date he was tried. The Court concluded that petitioner failed to demonstrate that counsel's conduct in not having the test performed was unreasonable. Petitioner also contended that counsel was ineffective for not seeking a "sleep test" to prove that the petitioner was impotent and could not pos-

sibly have raped the victim. The Court found that this claim was meritless because the victim testified that petitioner penetrated her vagina with his penis and that is all that is required to prove rape. The Court stated that even if the petitioner could have proven he was impotent, that would not have proven that he was incapable of raping the victim. Accordingly, the Court denied the petition. *Foster v. State*, CR–87–138, 1990 WL 81318 (Ark.Sup.Ct. June 11, 1990).

### II. Foster's Petition for Writ of Habeas Corpus.

In his petition for writ of habeas corpus, petitioner contends that:

(1) defense counsel was ineffective for failing to seek a "sleep test" or present other evidence showing that petitioner was impotent and could not have committed the rape in the manner in which the victim alleged;

(2) defense counsel was ineffective for failing to seek genetic testing, which would have excluded petitioner as the rapist;

(3) defense counsel was ineffective for failing to present the testimony of crucial alibi witnesses;

(4) defense counsel was ineffective for failing to present medical evidence and testimony relating to petitioner's lack of mobility;

(5) defense counsel was ineffective for failing to present testimony or other evidence relating to petitioner's dental condition, which would have shown that petitioner was unable to attack the alleged victim with his teeth;

(6) petitioner was denied due process based upon the improper and prejudicial remarks made by the prosecutor during closing argument;

(7) petitioner was denied due process and a fair trial by the State's presentation of a false serological theory; and

(8) defense counsel was ineffective for failing to object to or present evidence to contradict the false serological evidence and argument presented by the State.

A. Ineffective Assistance of Counsel: Failure to Seek a Sleep Test or Present Other Evidence to Show Petitioner was Impotent.

Petitioner first contends that defense counsel was ineffective for failing to seek a "sleep test" or present other evidence showing that petitioner was impotent and could not have committed the rape in the manner in which the victim alleged.

■ The standard for effective assistance of counsel is found in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Supreme Court established a two-prong standard to govern ineffective assistance claims. To obtain relief, the petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 686–93, 104 S.Ct. at 2064–68. This two-fold showing is required to overcome the presumption that counsel rendered constitutionally sufficient representation. *Beans v. Black,* 757 F.2d 933, 936 (8th Cir.), *cert. denied,* 474 U.S. 979, 106 S.Ct. 381, 88 L.Ed.2d 334 (1985). Failure of counsel to seek a particular scientific test will not amount to denial of effective assistance of counsel unless petitioner shows that the test was one which a reasonable attorney under the circumstances would have sought. *Dumond v. Lockhart,* No. PB–C–88–631, 1989 WL 10531, at *6, 1989 U.S.Dist.Lexis 994, at 8 (E.D.Ark. January 31, 1989), *reversed on other grounds,* 885 F.2d 419 (8th Cir.1989). *See also Dumond v. State,* 294 Ark. 379, 743 S.W.2d 779 (1988).

At the habeas hearing held in this Court on August 26 and October 6, 1992, Dr. Alex Finkbeiner, a professor of urology at the University of Arkansas for Medical Sciences (UAMS), testified as an expert for the petitioner. He stated that at his direction, petitioner, who reported impotency and paralyzation in the saddle area, was given an NPT (nocturnal penile tumescence) or sleep test in April of 1987 by Dr. Lawrence Scrima. The test showed that petitioner had organic or physical impotency. Finkbeiner testified that the sleep test, which has been in use for twenty years, was available in 1986 and 1987 and is the *sine qua non* test for impotence. Finkbeiner testified that he had reviewed the trial testimony and that based upon the medical evaluation, it was highly unlikely that petitioner got an erection and ejaculated in three minutes with an unwilling partner in 1987. He stated that generally a person with petitioner's condition would need help from his sexual partner to get an erection. He also testified that from a medical standpoint, it was difficult to believe that petitioner could perform the rape as alleged. He added that the sperm was non-motile four or five hours after the rape, yet the usual life span for sperm is twenty-four to forty-eight hours.

Kent Rhinehart, an expert in orthotics and prosthetics, testified that it would have been discomforting for petitioner to have sex in the position in which the victim testified that she was raped. Danica Fortner, who has known petitioner for ten years, testified that in 1986 or 1987 she and petitioner tried to have sex most of one night, but petitioner could not get an erection. Elicia Roberds testified that she and petitioner tried to have sex together many times in early 1987, that he could not get a complete erection, and that he could achieve slight penetration sometimes. She testified that there is no way he could have raped the victim the way she alleged.

Louise Scott, petitioner's sister and a police officer employed by the North Little Rock Police Department, testified that on two occasions prior to trial she talked with petitioner's trial counsel. She stated that counsel became angry when she and petitioner wanted to use other evidence showing petitioner could not have committed the crime. Counsel told her that he did not want to "clutter up" the trial. Scott also testified that she made counsel aware that petitioner was impotent and asked him to pursue an impotency defense and contact girlfriends with whom petitioner attempted to have sex. Counsel replied that testing

was expensive and that an impotency defense and alibi defense were inconsistent.

Petitioner testified that he is paralyzed around the saddle area, down the back of his legs, and across his feet and toes. He stated that in 1986, he could get an erection but it often took two hours to get one and because he is paralyzed, he could not feel one when he had one. He stated that the quickest he can get an erection is thirty minutes to one hour and that fondling is required to do so. He emphasized that he could never get erection and insert in two or three minutes, and stated that he is not sure he can ejaculate. Petitioner testified that his condition is the same as it was in 1986 and 1987. Petitioner also testified that he told counsel that he could have sex and informed him that he had problems with having sex and could not have sex at anytime he wanted. He stated that he informed counsel of girlfriends who could testify to the problems he has. He also testified that he explained his problems with having sex to counsel and asked him about getting a scientific test to prove he could not have raped the victim. Counsel replied that it was unnecessary work and that the alibi and impotency defense were inconsistent. He testified that counsel said, "First, you wanted me to prove you were not there. Now you want to prove that if you were there you could not have done it."

Trial counsel testified that he felt that petitioner's main defense was alibi, but that petitioner's impotency was mentioned to him by petitioner and Louise Scott. Counsel stated that because petitioner told him he was capable of having sex and a doctor at UAMS told him that an impotent person could produce sperm, he did not pursue the impotency defense or set up a sleep test. He also testified that he may have said to petitioner and Scott, "You first wanted me to prove he was not there. Now you want me to prove he could not have done it if he was there." He stated that the defenses of alibi and impotency are inconsistent, but that the defenses could compliment each other. Counsel added that petitioner told him that a girlfriend could testify that he was able to have sex.

The prosecution's theory of the case at trial was that the rapist penetrated the victim and ejaculated within a few minutes. The evidence shows that petitioner was organically impotent in 1987 and at the time of the rape. According to the testimony of Dr. Finkbeiner, which the Court finds to be credible, it is highly unlikely that petitioner got an erection and ejaculated in a few minutes with an unwilling partner in 1986. Undoubtedly, petitioner and Louise Scott apprised counsel of petitioner's impotency and inability to have sex within a short period of time. Furthermore, petitioner asked counsel to have a test performed to show he could not have raped the victim. The sleep test, which was and is a widely recognized test, was available in Arkansas in 1986 and 1987. Counsel did not pursue the defense that petitioner could not have raped the victim in the manner in which she alleged because he felt the alibi and impotency defenses were inconsistent, petitioner told him he could have sex, and because a doctor at UAMS told him an impotent person could produce sperm.

Counsel seems to have focused only on whether the petitioner could have committed the crime and not on whether or not it was likely he could have committed the crime. Contrary to counsel's belief, the defenses of alibi and impotency are not inconsistent. What counsel could have shown by proving both defenses is that it is highly unlikely that petitioner could have raped the victim for two reasons—because he was not there and because the rapist penetrated and ejaculated within a short period of time. A sleep test showing organic impotency would have been the primary vehicle by which petitioner could have demonstrated that it was improbable that he committed the crime in the manner in which the victim alleged. The Court finds that a reasonable attorney under the circumstances would have pursued the defense that it was highly unlikely petitioner could have raped the victim in the manner alleged, sought a sleep test, and introduced medical and lay testimony to support the defense. Accordingly, the Court concludes that counsel's performance was objectively

unreasonable. The Court further finds that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. In sum, the Court finds that petitioner was deprived of effective assistance of counsel.

### B. Denial of Due Process: The Prosecution's Presentation of a False Serological Theory.

Petitioner contends that he was denied due process and a fair trial by the prosecution's presentation of a false serological theory.

As noted above, the prosecutor, through Dr. Vollman, introduced evidence that sixteen (16) percent of the male population are blood group "A" secretors, that the "A" and "H" blood group substances found on the vaginal swabs could have come from anyone who belonged to blood group "A" and was a secretor, and that the petitioner is an "A" secretor.

During closing argument, the prosecutor stated:

> You also have Dr. Vollman's testimony, the serologist at the Crime Lab, who testified that ... [the victim] has "A" blood type. That she's a secretor, and the Defendant, David Foster, also has "A" blood type, and he is also a secretor. There is a presence, a test for—A wet prep test done for sperm. It was found present in ... [the victim]. That a certain percentage of the population has this type of blood group, and are secretors also. Thirty-two per cent of the population of all Caucasians. So you have 32% of the world population has blood type "O" and is also a secretor, which means that they secrete that blood type into their body fluids, just like David Foster, the man sitting before you today, the Defendant who's been positively identified. So, if you multiply the percentage of the blood group by the secretion level, you get 32%. You can effectively have that male and females in this population. And 16% of all the people in the world could have raped ... [the victim]. And of that 16% of that world population, who has that blood group? And who has that blood type? David Foster does. David Foster, the man who raped ... [the victim]. Tr. 286–87.

At the habeas hearing, Dr. James Geyer, a clinical immunologist, testified that forty (40) percent of the caucasian population has blood group "A" and that eighty (80) percent of the population is capable of secreting blood group "A." He stated that Vollman correctly calculated the percentage of "A" secretors as thirty-two (32) percent. However, he testified that Vollman's testimony that sixteen (16) percent of the male population are "A" secretors was incorrect since if one tested 2000 males, thirty-two (32) percent of them would be "A" secretors. More importantly, Geyer testified that the only people that can be excluded as depositors of the "A" and "H" blood group substances in this case are "B" and "AB" secretors, which respectively comprise 8.4% and 2.96% of the male population. Accordingly, only 11.36% of the male population can be excluded as the depositor in this case, which means that 88.64% of the population cannot be excluded.

Ed Vollman, the serologist who testified at trial, corroborated Geyer's testimony, stating that thirty-two (32) percent, not sixteen (16) percent, of the male population are "A" secretors and that the prosecutor's statement that only sixteen (16) percent of the male population could have deposited the "A" and "H" blood group substances in the victim's vagina was false.

Defense counsel testified that he assumed Vollman's testimony concerning the "ABO" evidence was correct, but now agrees that it was not. He admits it would have been helpful if he had offered evidence that approximately eighty-nine (89) percent of the male population could not be excluded as the depositor of the "A" and "H" blood group substances. The prosecutor testified that she argued that only sixteen (16) percent of male population could have committed the crime based upon Vollman's testimony. She agreed that it would be unfair to use the sixteen (16) percent figure if the percentage is higher than six-

teen (16) percent, that she had no intent to mislead the jury, and that she relied on Vollman. The prosecutor's pretrial notes in this case were admitted into evidence as petitioner's Exhibit 14. One note states, "Only AB and only B could be excluded."

█ The proper role of the criminal prosecutor is not simply to obtain a conviction, but to obtain a fair conviction. *Brown v. Borg,* 951 F.2d 1011, 1015 (9th Cir.1991). Where a prosecutor's case includes false testimony or the prosecutor fails to correct false testimony and she knew or should have known of the false testimony, a conviction obtained as a result is fundamentally unfair and must be set aside as violative of a defendant's right to due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. *See United States v. Nelson,* 970 F.2d 439, 443 (8th Cir.1992) (citing *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976), and *Napue v. Illinois,* 360 U.S. 264, 269–70, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959)). *See also United States v. Foster,* 874 F.2d 491, 495 (8th Cir.1988); *United States v. Bigeleisen,* 625 F.2d 203, 208 (8th Cir.1980); *Blair v. Armontrout,* 916 F.2d 1310, 1324 (8th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 89, 116 L.Ed.2d 62 (1991); *Brown v. Borg,* 951 F.2d at 1015.

█ In the present case, the prosecution presented evidence and argued in closing that only sixteen (16) percent of the male population could have deposited the "A" and "H" blood group substances in the victim's vagina and that petitioner was within this relatively small group. In short, the testimony at the hearing conclusively establishes that the prosecution's evidence that only sixteen (16) percent of the male population could have deposited the blood group substances was false. In fact, approximately eighty-nine (89) percent of the male population could not be excluded as the depositor. The Court finds that evidence presented at the hearing shows

that the prosecution should have known that this evidence was false. The Court finds that this false evidence, coupled with the victim's testimony, was vital in obtaining petitioner's conviction. The Court concludes that there is a reasonable likelihood that the false testimony could have affected the judgment of the jury. Accordingly, the Court finds that petitioner's due process right to a fair trial was violated.

█ In so finding, the Court notes that respondent contends that this claim is procedurally barred. The Court acknowledges that the petitioner has procedurally defaulted this claim because he did not present the claim to an Arkansas appellate court and he has no non-futile state remedies available. *See Smittie v. Lockhart,* 843 F.2d 295, 296 (8th Cir.1988). However, if a petitioner has procedurally defaulted his federal claims, he can obtain review if he shows cause for his default in state court and actual prejudice as a result of the constitutional violation. *Wainwright v. Sykes,* 433 U.S. 72, 88–90, 97 S.Ct. 2497, 2507–08, 53 L.Ed.2d 594 (1977). The existence of cause "must ordinarily turn on whether the prisoner can show some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986). For example, a showing that the factual or legal basis for the claim was not reasonably available to counsel, that some interference by officials made compliance impracticable, or that counsel's performance was constitutionally ineffective under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984),[1] would constitute factors external to the defense and cause for a procedural default. *Coleman v. Thompson,* —— U.S. ——, ——, 111 S.Ct. 2546, 2566–67, 115 L.Ed.2d 640 (1991).

The prosecution, after presenting false evidence, had a duty to disclose to petitioner that the State used false serological evidence to convict him. The Court finds

---

**1.** The exhaustion doctrine "generally requires that a claim of ineffective assistance of counsel be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." *Murray v. Carrier,* 477 U.S. at 489, 106 S.Ct. at 2646.

that the prosecutor's failure to disclose made compliance with the State's procedural rules impracticable and constitutes a factor external to the defense and cause for petitioner's procedural default. *See Bliss v. Lockhart,* 891 F.2d 1335, 1341–42 (8th Cir.1989). *See generally Julius v. Jones,* 875 F.2d 1520, 1525 (11th Cir.1989). The Court also finds that petitioner has shown prejudice as a result of the constitutional violation. Accordingly, the Court concludes that petitioner's claim is not procedurally defaulted.

The Court also notes that petitioner has alleged that he has met the "fundamental miscarriage of justice" standard by showing by "clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner [guilty] under the applicable state law." *Sawyer v. Whitley,* —— U.S. ——, ——, 112 S.Ct. 2514, 2517, 120 L.Ed.2d 269 (1992); *McCoy v. Lockhart,* 969 F.2d 649, 650–51 (8th Cir.1992). Unquestionably, petitioner was denied an effective defense and deprived of a fair trial by the prosecution's use of false evidence. Notwithstanding, the Court finds that petitioner has not shown by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found him guilty of rape under Arkansas law. In fact, the Court cannot envision a circumstance where the present standard could be met in a rape case in Arkansas where the victim identifies the petitioner at trial as the culprit,[2] or there is other evidence sufficient to support the conviction. In such circumstances, a reasonable juror always could find the petitioner guilty based upon the victim's testimony or other sufficient evidence—no matter how grave

the constitutional error. It appears that the "fundamental miscarriage of justice" standard, in effect, has become a *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), sufficiency standard, and the Court finds that petitioner has not met it.

III. Conclusion.

The Court finds that petitioner has demonstrated two errors of constitutional dimension. Accordingly, the Court orders that a writ of habeas corpus shall issue unless the State tries the petitioner within 120 days.[3]

THEREFORE, the Court orders that a writ of habeas corpus shall issue unless the State tries petitioner within 120 days.

IT IS SO ORDERED.

2. Under Arkansas law, the positive identification of a defendant by a prosecutrix alone is sufficient to sustain a rape conviction. *Clay v. State,* 290 Ark. 54, 716 S.W.2d 751 (1986). Accordingly, where a prosecutrix positively identifies a defendant or there exists other evidence sufficient to support a conviction, a trial court cannot grant a directed verdict of acquittal. In Arkansas, issues of fact must be tried by a jury, Ark.Code Ann. § 16–89–107 (1987), and judges are prohibited from charging juries with regard to matters of fact, Ark. Const. art. 7, § 23, *Seale v. State,* 240 Ark. 466, 400 S.W.2d 269 (1966). A

directed verdict of acquittal is proper only when no material issue of fact exists for the jury to determine. *McEwen v. State,* 302 Ark. 454, 790 S.W.2d 432 (1990). For instance, a directed verdict of acquittal is appropriate where the State presents no evidence with regard to an element of the charged offense. *Roland v. State,* 260 Ark. 404, 540 S.W.2d 590 (1976).

3. In so ordering, the Court finds it unnecessary to address the petitioner's remaining contentions.