David A. FOSTER, Appellee,

v.

A.L. LOCKHART, Director, Arkansas Department of Correction, Appellant.

David A. FOSTER, Appellant,

v.

A.L. LOCKHART, Director, Arkansas Department of Correction, Appellee.

Nos. 92–3702, 93–3884.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 16, 1993.

Decided Nov. 19, 1993.

---

Darnisa Evans Johnson, Little Rock, AR, argued, for appellant.

Craig Lambert, Little Rock, AR, argued, for appellee.

Before FAGG, BOWMAN, and LOKEN, Circuit Judges.

FAGG, Circuit Judge.

A.L. Lockhart, director of the Arkansas Department of Correction, appeals the district court's order granting the habeas petition of David A. Foster, a man convicted of rape in Arkansas state court. Lockhart also appeals the district court's order releasing Foster on bail. We affirm.

Although we prefer not to repeat the graphic testimony at Foster's trial and evidentiary hearing, the explicit details of the rape victim's story and Foster's impotency show the failure of Foster's trial attorney to investigate, develop, and present the strong defense of Foster's impotency amounted to ineffective assistance of counsel.

At trial, the victim testified that the rape happened in the following way. Foster, a friend of the victim's daughter, had come to the victim's home between four and five o'clock in the morning on August 16, 1986. Foster stated he was looking for the victim's daughter, who had borrowed his car and not yet returned it. The victim had seen Foster once before and invited him inside. Foster sat on a chair several feet from the victim, then suddenly jumped up, ran over to her, and ripped off her blouse. The victim struggled with Foster, but he removed her shorts and panties. The victim broke free and ran out the front door, down some steps, and around to the back of the house. Foster chased her outside, caught her, shoved her onto the ground, jumped on her, penetrated her vagina with his penis, and ejaculated. The incident lasted "just a few minutes," and afterwards, Foster left "real fast." The victim did not notice anything wrong with the rapist's legs. After the rape, the victim contacted the police, described her attacker, and identified him as "David." She later identified Foster in a photographic lineup and at trial.

Other witnesses also testified for the prosecution. The doctor who examined the victim about four hours after the alleged rape found nonmotile sperm inside her, but no evidence of traumatic intercourse. The doctor stated sperm are motile for up to forty-eight hours. A forensic serologist testified about blood typing tests performed on the victim's vaginal sample that showed Foster could have been the rapist. Although 89% of the male population could have produced the semen found in the victim, the State incorrectly argued that only 16% of the male population could have produced it. The police officer who investigated the rape also testified and said that when she arrested Foster, he was wearing a leg brace.

A state public defender represented Foster at trial and presented an alibi defense. Foster testified and denied raping the victim or going to her house on the morning of the rape. Foster explained his activities that morning and said he was at home sleeping during the hour of the rape. Foster also explained his physical impairments resulting from a car accident in 1980 and an earlier motorcycle accident. Foster said he is partially paralyzed in his saddle area, down the backs of his legs, and across his feet and toes. Foster always wears a leg brace on his right leg. Foster testified he is sexually dysfunctional, has "bad nerve damage," and "it takes a lot to get [him] ready for sex."

Foster's father testified Foster was in the house asleep during the hour of the rape. He also said Foster got around fairly well on level ground, but limps and cannot run. Foster's mother corroborated this testimony. In addition, a physical therapist testified Foster was admitted to the rehabilitation center where she works after his automobile accident in 1980. Foster's diagnosis was injury to the roots of his spinal nerves and severe injuries to his right lower leg, including severance of his right heel cord. The therapist had last treated Foster in October 1984, and stated Foster never recovered from the heel cord severance, his injury is permanent, he walks with a limp, and it would be difficult for him to run. Foster's attorney attempted to admit Foster's medical records through this witness, but was unsuccessful.

A jury convicted Foster of rape. *See* Ark. Code Ann. § 5–14–103 (Michie 1987). The Arkansas Supreme Court affirmed Foster's conviction, *Foster v. State*, 294 Ark. 146, 741 S.W.2d 251 (1987), and in an unpublished opinion, denied Foster's petition for postcon-

viction relief. Foster then filed this habeas petition in federal district court asserting, among other things, that he received ineffective assistance of counsel because his attorney did not seek an impotency test or present other evidence showing Foster is impotent and could not have committed the rape as the victim alleged.

At an evidentiary hearing, Foster presented uncontradicted medical testimony that he is physically impotent and it is very unlikely that he could have committed the alleged rape. A urologist testified that Foster was given a nocturnal penile tumescence test (sleep test) in April 1987, a month after his trial. The test showed Foster is physically impotent. The urologist testified the test has been in use for twenty years and is the recognized test for impotence. According to the urologist, a person with Foster's condition would need help from his sexual partner to achieve an erection, it would have been very difficult for Foster to achieve an erection and ejaculate in a few minutes with a willing partner, and even more difficult for Foster to do so with an unwilling partner. The urologist reviewed the victim's testimony and said that based on Foster's test results, it was "highly, highly unlikely" that Foster could have committed the rape.

Foster also presented the testimony of two former girlfriends who had relationships with Foster in 1985 and early 1987. Both women testified about their attempts to have intercourse with Foster. Most attempts failed. A few attempts were partially successful with one of the women, with her patience and assistance. The woman said that, based on her experience, there was "no way" Foster could penetrate and ejaculate in just a few minutes.

Foster also testified at the evidentiary hearing. Foster said he told his attorney that although he was capable of having sex, he had some serious problems in that area and could not have sex anytime he wanted. Foster asked the attorney about getting a scientific test to prove he was not physically capable of raping anyone because of his sexual dysfunction. Foster also gave his attorney the names of former girlfriends who could testify about his great difficulty engaging in sex. The attorney told Foster that pursuing an impotency defense would be a waste of time because of the alibi defense, that the evidence would "clutter" the trial, that it would be expensive to have a test performed, and that the alibi and impotency defenses were inconsistent. Foster said the attorney told him, "First, you wanted me to prove you were not there. Now you want to prove that if you were there you could not have done it." Foster's sister, a police officer who was present during two of Foster's meetings with his attorney before the trial, confirmed Foster's testimony.

Foster's trial attorney testified that Foster and his sister told him about Foster's impotency, but the attorney believed Foster's main defense was alibi. The attorney said that he did not pursue the impotency defense or arrange a sleep test because Foster told him he could have sex and because an unidentified doctor told him an impotent person could produce sperm. The attorney admitted he may have told Foster and his sister that the defenses of alibi and impotency are inconsistent.

After conducting the evidentiary hearing, the district court ordered that a writ of habeas corpus should issue unless the State retried Foster within 120 days. *Foster v. Lockhart,* 811 F.Supp. 1363, 1372 (E.D.Ark. 1992). The district court held Foster's trial attorney was ineffective for failing to pursue the defense that Foster's impotence rendered him incapable of committing the rape in the manner the victim and State alleged. *Id.* at 1368–70. The district court also held Foster was denied due process as a result of the prosecution's presentation of false serological evidence. *Id.* at 1370–72.

■ To prove ineffective assistance of counsel, Foster must show his attorney's performance was deficient and the deficient performance prejudiced his defense. *Alexander v. Armontrout,* 985 F.2d 976, 978 (8th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 224, 126 L.Ed.2d 180 (1993). The performance of Foster's attorney was deficient if the attorney's representation was less than objectively reasonable. *Id.* The attorney's performance prejudiced Foster's defense if there is a reasonable probability that Foster would

not have been found guilty of rape in the absence of the deficient performance. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the trial's outcome. *Id.*

Lockhart asserts the performance of Foster's attorney was not deficient because the attorney's failure to obtain a sleep test and otherwise pursue an impotency theory was a reasonable choice of trial strategy. We disagree.

■ Reasonable performance of counsel includes an adequate investigation of facts, consideration of viable theories, and development of evidence to support those theories. An attorney must make a reasonable investigation in preparing a case or make a reasonable decision not to conduct a particular investigation. *Kenley v. Armontrout,* 937 F.2d 1298, 1304 (8th Cir.), *cert. denied,* 112 S.Ct. 431 (1991). Before an attorney can make a reasonable strategic choice against pursuing a certain line of investigation, the attorney must obtain the facts needed to make the decision. *See id.* An attorney's " 'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.' " *Id.* (quoting *Strickland v. Washington,* 466 U.S. 668, 690–91, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984)). Although we generally give great deference to an attorney's informed strategic choices, we closely scrutinize an attorney's preparatory activities. *Chambers v. Armontrout,* 907 F.2d 825, 831, 835 (8th Cir.) (en banc), *cert. denied,* 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 331 (1990).

The attorney's decision not to investigate an impotency defense further was unreasonable because the attorney lacked a reasonable basis for that decision. The attorney's investigation consisted of one telephone call to an unidentified urologist, who merely told the attorney an impotent person can produce and emit sperm. The attorney did not ask the urologist whether an impotent person could commit a rape in only a few minutes, or explain the situation in any way. If the attorney had investigated further, he would have discovered objective medical evidence casting substantial doubt on the victim's story, and witnesses who could confirm the medical evidence.

The attorney's presentation of an alibi defense does not excuse his failure to investigate further and present evidence of Foster's impotency. A tactical decision to pursue one defense does not excuse failure to present another defense that "would bolster rather than detract from [the primary defense]." *Lawrence v. Armontrout,* 900 F.2d 127, 130 (8th Cir.1990). Contrary to the reasoning of Foster's attorney, an impotency defense would have reinforced Foster's alibi defense by showing it was even more unlikely Foster raped the victim. The impotency defense would have helped Foster considerably because Foster's alibi defense was vulnerable. The only witnesses who could account for Foster at the time of the alleged rape were his parents, who were subject to impeachment for bias. The vulnerability of the alibi evidence shows the unreasonableness of the attorney's failure to investigate further and present the impotency defense. As the district court aptly noted, Foster's attorney "focused only on whether [Foster possibly] could have committed the crime and not on whether or not it was likely he could have committed the crime." 811 F.Supp. at 1369. Like the district court, we conclude Foster's attorney did not investigate Foster's impotency enough to make a reasonable decision not to present the defense at trial. Thus, the attorney's performance was deficient.

■ Lockhart asserts that even if Foster's attorney had obtained a sleep test and presented evidence of Foster's impotency at trial, it is improbable that the trial's result would have been different because the evidence would not have proven that Foster was incapable of raping the victim. Lockhart relies on Arkansas law that holds the victim's testimony alone is sufficient to convict a person of rape. To show his attorney's deficient performance prejudiced him, however, Foster need not show that he could not have been convicted. Instead, he need only undermine our confidence in the trial's outcome. *Alexander,* 985 F.2d at 978. Except for the blood typing evidence, which falsely led the jury to believe Foster was in a small group of the male population that could have

produced the semen found in the victim, the only evidence against Foster was the victim's testimony. The uncontradicted medical evidence shows Foster was physically incapable of committing the rape in the manner the victim and State alleged at trial. We conclude there is a reasonable probability that the trial's outcome would have been different if Foster's attorney had presented evidence of Foster's impotency. Having shown his attorney's performance was deficient and the deficiency prejudiced his defense, Foster established his ineffective assistance of counsel claim.

■ Because we conclude Foster was denied effective assistance of counsel, we need not decide whether the State violated Foster's due process rights by presenting false serological evidence, Lockhart's related claim of procedural bar, or Foster's related actual innocence claim raised in his cross-appeal. We now turn to the remaining issues on appeal.

■ Lockhart contends the magistrate judge who tried the case by consent of the parties under 28 U.S.C. § 636(c)(1) lacked power to order Foster's release on bail after granting the writ of habeas corpus. Lockhart asserts that only a district court has the power to order the release of a habeas petitioner on bail. We disagree. Federal district courts have power to order a successful state habeas petitioner's release with or without bail, Fed.R.App.P. 23(c), and there is nothing to indicate a magistrate judge cannot exercise this power in a case tried to a magistrate judge under the parties' consent, *In re Wainwright*, 518 F.2d 173, 175 n. 1 (5th Cir.1975) (per curiam). The magistrate judge considered the appropriate factors in deciding whether to release Foster pending appeal. *See Hilton v. Braunskill*, 481 U.S. 770, 776–78, 107 S.Ct. 2113, 2119–20, 95 L.Ed.2d 724 (1987). We presume the release order is correct, and Lockhart does not even assert there are any "special reasons" warranting the release order's modification. *Workman v. Tate*, 958 F.2d 164, 166–67 (6th Cir.1992); *see* Fed.R.App.P. 23(d). We also reject Lockhart's assertion that the consent form signed by the parties did not encompass the power to release Foster on bail. The

consent form provided, "The magistrate judge shall be empowered to conduct any or all further proceedings and to order the disposition of the matter and the entry of an appropriate judgment." In our view, Foster's release on bail fell within this broad language.

Last, Foster contends we should dismiss Lockhart's appeal and order Foster unconditionally discharged without a retrial because the 120–day time limit for retrying Foster has expired and no court has granted a stay. Lockhart, on the other hand, asserts the district court lacks power to prevent the State from retrying Foster. We disagree with both parties.

■ A district court has authority to preclude a state from retrying a successful habeas petitioner when the court deems that remedy appropriate. *Burton v. Johnson*, 975 F.2d 690, 693 (10th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1879, 123 L.Ed.2d 497 (1993). Nevertheless, this is an extraordinary remedy that is suitable only in certain situations, such as when a retrial itself would violate the petitioner's constitutional rights. *See Latzer v. Abrams*, 615 F.Supp. 1226, 1230 (E.D.N.Y.1985). Contrary to Foster's view, however, we do not read the district court's order as precluding Foster's retrial. The district court's order stated that "a writ of habeas corpus shall issue unless the State tries [Foster] within 120 days." We think the effect of the writ's issuance is Foster's release from custody under the unconstitutional conviction. By referring to 120 days, the district court merely gave the State a reasonable time to correct the constitutional defects that make Foster's current custody unlawful.

■ Our view is reinforced by the district court's order granting Foster's release on bail, which stated the court had "granted a conditional writ." The issuance of a writ is conditional when the district court delays a state prisoner's release from custody for a reasonable time to give the state an opportunity to correct the constitutional defects that make the prisoner's current custody unlawful. *Moore v. Zant*, 972 F.2d 318, 320 (11th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1650, 123 L.Ed.2d 271 (1993). If the state fails to correct the defect within the given time and the prisoner is released from custody, the state may usually still rearrest

and reprosecute the prisoner. *Id.* We thus conclude the district court's issuance of the writ does not preclude the State from reprosecuting Foster.

Because we affirm Foster's release on bail, we need not consider Lockhart's assertion that the State was deprived of an adequate opportunity to appeal the bail order.

We affirm the district court.