1998 SD 7

**Garrett Larry LIEN, Applicant and Appellant,**

v.

**Joseph CLASS, Warden of the South Dakota State Penitentiary, Appellee.**

**No. 19953.**

Supreme Court of South Dakota.

Argued Oct. 21, 1997.

Decided Jan. 14, 1998.

Rehearing Denied Feb. 12, 1998.

---

Rita Allen of Hagen, Wilka & Archer, Sioux Falls, for applicant and appellant.

Mark Barnett, Attorney General, Timothy Bartlett, Assistant Attorney General, Pierre, for appellee.

GILBERTSON, Justice.

[¶ 1.] Applicant and appellant, Garrett Larry Lien (Lien), alleges his prior guilty plea was entered involuntarily as a result of his defense counsel's alleged ineffective assistance in failing to properly investigate a motor vehicle accident and in failing to retain an accident reconstruction expert. Lien also contends that the prosecution failed to disclose exculpatory evidence thus denying him due process of law. Lien appeals from an order entered in the Third Judicial Circuit denying his petition for writ of habeas corpus. We affirm.

## FACTS AND PROCEDURE

[¶ 2.] On August 11, 1995, a "teen" dance was being held at a country club near Lake Kampeska in Watertown, South Dakota. Lien, age 21, was present and was the owner of a 1972 four-wheel drive Chevrolet Blazer that had its roof removed. At approximately

10:20 p.m., after exiting the country club parking lot, the Blazer careened off of a parked car, and then rolled over. Adam Dailey (Dailey), then age 15, a passenger in the rear seat was thrown clear of the vehicle. The first observers on the scene found Lien and Joshua West (West) pinned beneath the driver's side of the Blazer. Bystanders were able to lift the Blazer enough to pull Lien out from under the vehicle. However, West could not be removed and died as a result of his injuries. It was later determined that all three occupants had consumed alcohol before the accident.[1] At the hospital a bag of marijuana fell out of Lien's shorts.

[¶ 3.] Lien claims, due to accident injuries, he does not remember whether he was driving. However, Dailey, who was interviewed by the police the night of the accident and the following day, stated that Lien was driving the Blazer at the time of the collision. Dailey also testified, under oath, before a Codington County Grand Jury that Lien was driving at the time of the accident.

[¶ 4.] Lien was indicted on August 30, 1995 on a charge of vehicular homicide, SDCL 22–16–41, and possession of more than one ounce but less than one-half pound of marijuana. SDCL 22–42–6. Lien independently retained the professional services of an attorney, Albert Holgerson (Holgerson), to represent him against these charges. The record indicates that Holgerson had experience in defending vehicular homicide cases and had successfully defended his most recent client

in this kind of criminal proceeding. Holgerson's investigation of the accident consisted of reviewing accident scene photographs, witness statements, police reports, grand jury testimony, and a videotaped interview with Dailey. In addition, he interviewed certain witnesses and filed and argued numerous motions, including a suppression motion.

[¶ 5.] Holgerson did not interview all the prosecution witnesses, did not show some of the actual accident photos to Lien, and did not show the Dailey videotaped interview to Lien.[2] However, the habeas court found Holgerson discussed the contents of these exhibits and materials "in depth" with Lien as well as the context of the grand jury transcript. Holgerson considered but decided against hiring an accident reconstruction expert because he felt the best case scenario would pit his expert against the State's expert and Dailey, the only accident eyewitness. Holgerson and Lien were aware of some discrepancies[3] with Dailey's account of the accident. However, Holgerson felt that Dailey was credible and would be a strong witness who could not be successfully impeached during a trial.[4]

[¶ 6.] Holgerson testified he had three to four meetings with Lien discussing the State's evidence leading up to the plea. Lien's father was present 50 to 70 percent of the time.[5] After reviewing certain evidence with Lien and obtaining his consent, Holgerson entered into plea negotiations with the

1. The South Dakota State Health Laboratory tests of Lien's blood and urine indicated a blood alcohol level of .174% and the presence of marijuana. Prairie Lakes Hospital also conducted tests on Lien's blood and urine and indicate that his blood alcohol level was .40% and do not clearly indicate the presence of marijuana. Despite the disparity between the blood tests they do show that Lien was drinking alcohol.

Dailey also tested positive for marijuana and his blood alcohol level was .031%. West had a .11% blood alcohol level.

2. Holgerson testified that at all times prior to the plea of guilty, the actual taped interview with Dailey remained in the possession of the police who allowed Holgerson to view it, but did not provide him with a copy.

3. In the August 12, 1995 videotaped interview Dailey stated that he did not remember the acci-

dent itself but did remember that Lien was driving. Dailey was not aware that Lien had been drinking before Dailey entered the Blazer. Dailey also stated that he did not remember if the Blazer's headlights were on, but while leaving the parking lot West had told Lien to turn them on. Dailey testified before a grand jury on August 30, 1995 and stated that he was aware that Lien had been drinking "a lot" before Dailey entered the Blazer.

4. In attempting to find a basis to impeach Dailey, Holgerson went so far as to subpoena from the Watertown High School, "all school records for Adam Dailey, including but not limited to all academic records, guidance counselor records and detention records."

5. Lien's father testified that, on the day after the accident, he had a conversation where Dailey stated he did not remember if Lien was driving.

State. Holgerson's negotiations proved successful and the State agreed to recommend a suspended imposition of sentence for the vehicular homicide charge. The record is unclear as to the exact date when the agreement was finalized between the State and Lien.

[¶ 7.] Lien was sentenced on January 10, 1996. Holgerson presented mitigating testimony through Lien's Alcoholics Anonymous sponsor who stated that Lien's rehabilitation efforts were sincere and that he felt that Lien would "make it." The State informed the court that a suspended imposition of sentence for the vehicular homicide charge "continues to be our recommendation." The State explained it had made the agreement after consulting Joshua West's parents, who indicated some reluctance about having to endure a trial. The State then brought out several aggravating factors such as Lien's age in relation to the Blazer's occupants and the fact that he had been drinking and had marijuana in his possession. On the other hand, the State informed the court that Lien is "a young man, and I think that ... weighs to his benefit" and urged that Lien not be sent to prison. Mr. West had informed the State that Lien should not be sent to prison but should be punished in some other way such as jail time for the marijuana possession. The trial court found a factual basis for the guilty plea [6] but refused to follow the State's recommendation for suspended imposition of sentence. Rather, it sentenced Lien to 10 years in the South Dakota State Penitentiary, with four years suspended.[7] Additionally, upon release Lien was ordered to serve five years on probation and 180 days in the Codington County Detention Center for possession of the marijuana.

[¶ 8.] Lien petitioned for a writ of habeas corpus and a hearing was held on October 2, 1996. Lien claimed that Holgerson was ineffective for failing to properly investigate the accident which could have cast doubt on whether Lien was the driver of the Blazer. This ineffectiveness, Lien argued, resulted in an involuntary plea of guilty. Lien further claimed that the State failed to disclose exculpatory evidence. The habeas court denied Lien's petition for relief.

[¶ 9.] Lien's issues on appeal are:

1. Whether Holgerson's investigation constitutes ineffective assistance of counsel?

2. Whether Lien's guilty plea was voluntary?

3. Whether Lien has sustained his burden of proof in his claim that the prosecution failed to disclose exculpatory evidence in violation of due process?

## SCOPE AND STANDARD OF REVIEW

[¶ 10.] We must first note the remedy in a habeas proceeding is in the nature of a collateral attack on a final judgment, therefore, our scope of review is limited. *Black v. Class*, 1997 SD 22, 560 N.W.2d 544. It is not a substitute for direct review. *Loop v. Class*, 1996 SD 107, ¶ 11, 554 N.W.2d 189, 191.

> Habeas corpus can be used only to review (1) whether the court had jurisdiction of the crime and the person of the defendant; (2) whether the sentence was authorized by law; and (3) in certain cases, whether an incarcerated defendant has been deprived of basic constitutional rights. For purposes of habeas corpus, constitutional violations in a criminal case deprive the trial court of jurisdiction

*Black*, 1997 SD 22 at ¶ 4, 560 N.W.2d at 546 (quoting *St. Cloud v. Leapley*, 521 N.W.2d

---

6. Lien did not challenge the factual basis established by the State and accepted by the court at the November arraignment. Further, the failure of a trial court to establish a factual basis does not reach the constitutional or jurisdictional proportions necessary to bring the question within the scope of habeas corpus. *Petrilli v. Leapley*, 491 N.W.2d 79, 82 (S.D.1992).

7. The court specifically asked Lien, "And do you understand that ... what the State recommends isn't necessarily what the Court will do?" Lien indicated, "yes." The trial court stated that it was not following the recommendations of counsel as: Lien's driving privileges had been revoked at the time of the accident; Lien took beer on the night in question without his father's permission; Lien was with two minors; Lien's prior record, which included an accident where he was initially charged with DUI; and Lien's pattern of alcohol abuse.

118, 121 (S.D.1994) (*St. Cloud III* ) (internal citations omitted)).

[¶ 11.] The habeas petitioner has the initial burden to prove by a preponderance of the evidence that he is entitled to relief. *Johnson v. Zerbst*, 304 U.S. 458, 469, 58 S.Ct. 1019, 1025, 82 L.Ed. 1461, 1469 (1938); *Loop*, 1996 SD 107 at ¶ 14, 554 N.W.2d at 191; *Two Eagle v. Leapley*, 522 N.W.2d 765, 768 (S.D.1994). The habeas court's factual findings are given "considerable deference" and we will not reverse these findings unless they are clearly erroneous. *St. Cloud III*, 521 N.W.2d at 121; *McCafferty v. Solem*, 449 N.W.2d 590, 592 (S.D.1989) *cert denied, McCafferty v. Leapley*, 503 U.S. 911, 112 S.Ct. 1277, 117 L.Ed.2d 503 (1992); *Satter v. Solem*, 422 N.W.2d 425 (S.D.1988), *cert. denied, Rist v. Satter*, 490 U.S. 1091, 109 S.Ct. 2432, 104 L.Ed.2d 989 (1989).

[¶ 12.] Whether a defendant has received ineffective assistance of counsel presents a mixed question of law and fact. *Lykken v. Class*, 1997 SD 29, 561 N.W.2d 302 (1997). In the absence of a clearly erroneous determination, we defer to the habeas court's findings of fact regarding what counsel did or did not do, but we may substitute our own judgment "as to whether defense counsel's actions or inaction's constituted ineffective assistance of counsel." *Lykken* 1997 SD 29 at ¶ 6, 561 N.W.2d at 304–05 (quoting *Aliberti v. Solem*, 428 N.W.2d 638, 640 (S.D.1988)).

## ANALYSIS AND DECISION

[¶ 13.] **1. Whether Holgerson's investigation constituted ineffective assistance of counsel?**

[¶ 14.] This Court has adopted the *Strickland* test to determine whether a defendant received effective assistance of counsel as guaranteed by Article VI, § 7 of the South Dakota Constitution. *Luna v. Solem*, 411 N.W.2d 656, 658 (S.D.1987); *Woods v. Solem*, 405 N.W.2d 59, 61 (S.D.1987). "The standard that applies in evaluating claims of ineffective assistance of counsel challenges to guilty pleas is the same standard set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984). *Hill v.*

*Lockhart*, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985)." *Cox v. Lockhart*, 970 F.2d 448 (8thCir.1992). Under this standard, the burden is on the petitioner to show 1) that counsel's performance was deficient, and 2) that petitioner was prejudiced by the deficient performance. Addressing the first part of the *Strickland* test, deficient performance, we have stated that:

'When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness.' *Strickland*, 466 U.S. at 687–88, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. 'Judicial scrutiny of counsel's performance must be highly deferential.' *Id.* at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. 'Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.' *Id.* at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694–95 (citing *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83, 93 (1955)).

*Two Eagle*, 522 N.W.2d at 768 (quoting *Primeaux v. Leapley*, 502 N.W.2d 265, 267 (S.D. 1993)).

[¶ 15.] The second prong of the *Strickland* test concerns prejudice to the petitioner.

In many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led *counsel* to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence *likely* would

have changed the *outcome* of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial.

*Hill*, 474 U.S. at 59, 106 S.Ct. at 370, 88 L.Ed.2d at 210 (citation omitted) (emphasis added).

[¶ 16.] Subsequent to *Strickland*, the scope of the analysis was refined to not focus "solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair, or unreliable...." *Lockhart v. Fretwell*, 506 U.S. 364, 369–70, 113 S.Ct. 838, 842–43, 122 L.Ed.2d 180, 189; *see also Loop*, 1996 SD 107 at ¶ 15, 554 N.W.2d at 189; *Hopfinger v. Leapley*, 511 N.W.2d 845, 847 (S.D.1994).

[¶ 17.] Lien contends that Holgerson's performance was deficient and that this resulted in Lien entering an involuntary plea of guilty. *See United States v. Decoster*, 624 F.2d 196, 209 (D.C.Cir.1976) ("Holding a claim of failure to interview a witness may sound impressive in the abstract, but it cannot establish ineffective assistance when the person's account is otherwise fairly known to defense counsel."). Specifically, Lien contends that Holgerson failed to properly investigate the accident outside of the files of the prosecuting attorney and therefore Holgerson was not functioning as "counsel" as guaranteed Lien by the Sixth Amendment to the United States Constitution and by Article VI, § 7 of the South Dakota Constitution.

Reasonable performance of counsel includes an adequate investigation of facts, consideration of viable theories, and development of evidence to support those theories. An attorney must make a reasonable investigation in preparing a case or make a reasonable decision not to conduct a particular investigation.

*Foster v. Lockhart*, 9 F.3d 722, 726 (8thCir.1993) (citation omitted). Thus, our review is limited to a consideration of whether Holgerson had a reasonable basis for concluding that his investigation was sufficient to recommend that Lien plead guilty. We "consider all the circumstances" leading up to counsel's challenged conduct to determine whether they were reasonable. *Two Eagle*, 522 N.W.2d at 770.

[¶ 18.] Lien's reliance on *Thomas v. Lockhart*, 738 F.2d 304 (8thCir.1984), for the proposition that defense counsel's failure to conduct an investigation outside the files of the prosecuting attorney to be *per se* ineffective, is unpersuasive when applied to the facts of this case. The *Thomas* court did find ineffective assistance of counsel for, among other reasons, defense counsel's failure to contact three alibi witnesses whose names were supplied by the defendant.[8] *Id.* However, the *Thomas* court clearly distinguished its holding from cases such as Lien's "in which the defendant did not provide counsel with any information casting doubt on the events as portrayed by the files of the prosecuting attorney." *Id.* (citations omitted). Lien testified that he could not remember anything concerning the accident. As a result, he could not provide Holgerson with any information casting doubt upon the identity of the driver of his Blazer which would require him to conduct a more stringent investigation.

[¶ 19.] We agree with the habeas court that Holgerson's investigation of the accident and subsequent recommendation that Lien plead guilty falls within reasonable performance. Holgerson's investigation consisted of interviewing two witnesses who were near the accident scene, reviewing witness statements, police reports, grand jury testimony and the Dailey video. As in every criminal case, Holgerson's investigation was shaped by the evidence he received from the State and his client. The only eyewitness to the accident was Dailey, who identified Lien as the driver to a police officer at the scene, a police officer at the hospital, to a police officer the day after the accident, and to a grand jury. Hol-

---

8. Other factors supporting ineffective assistance of counsel included: giving the defendant and his family the impression that defendant would have to prove his innocence; telling defendant that a trial would be "futile" because of racial prejudice; and defense counsel's reluctance to handle the case because of its interracial aspect.

gerson felt that Dailey had no motive to lie and any inconsistencies in his account of the accident could be easily explained. Holgerson testified he could not find anything with which to impeach Dailey at trial.[9]

[¶ 20.] Concerning the specifics of Holgerson's investigation, Lien claims that Holgerson's failure to interview several witnesses in order to establish Lien's habit of letting others drive after he had been drinking constitutes deficient performance. It is important to note that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066, 80 L.Ed.2d at 695. Holgerson testified that Lien told him that "with one exception ... he didn't allow others to drive his vehicle ... [in the last year or 18 months before the accident]." Further, Lien testified that he told Holgerson "I drank quite a bit" that evening and had refused West's earlier request to drive. Holgerson testified he talked "to two young people who had seen [Lien] sitting behind the steering wheel in the Country Club [before] the accident." Although Shad Bradberry testified that right before trial was scheduled he had told Holgerson that he drove Lien's vehicle "quite a few times" when Lien had been drinking, Holgerson concluded that Lien's actual practice was *not* to allow others to drive his car. Particularly, as a result of Lien's own statements concerning his driving practice, Holgerson's investigation of Lien's habit and custom was not deficient. We conclude that Holgerson's investigation of Lien's habit and custom was sufficient under the circumstances.[10]

[¶ 21.] Lien next contends that Holgerson's failure to retain an accident reconstruction expert constitutes ineffective assistance of counsel. As we noted in *Fast Horse,* "The reasonableness of a decision not to investigate is to be judged according to the circumstances of each case with great deference given to the attorney's decision." 521 N.W.2d at 106 (citation omitted). This Court has often recognized that it is not our function to "second-guess the tactical decisions" of defense counsel and we will not "substitute [our] own theoretical judgment for that of counsel." *St. Cloud III,* 521 N.W.2d at 129; *Miller v. State,* 338 N.W.2d 673, 678 (S.D.1983) (citing *State v. McBride,* 296 N.W.2d 551, 553 (S.D.1980)).

[¶ 22.] Holgerson testified that he did not hire an accident reconstruction expert because,

> I thought there were real dangers in trying a technical case in front of a Codington County jury where we had an eye witness who I didn't think I could successfully impeach. However, *before going to the next stage,* [the State] agreed to recommend a suspended imposition of sentence.

(Emphasis added).

[¶ 23.] Holgerson was an experienced criminal trial lawyer who was a resident of the County in which the trial would be held. He was familiar with what type of jurors would be found in the jury panel. If Holgerson and his client proceeded to trial based on their "expert" defense Holgerson knew that the State would have substantial evidence to overcome it:

1. It was Lien's car that was involved in the accident;

**9.** Two points arise from this video. First it was conducted the day after the accident giving Dailey little time to fabricate any story and it was made at the same time Dailey is giving the same version of the facts to other investigating officers as to who was driving. Second, it preserved the manner in which the interview was given to allow not only Holgerson to conclude Dailey was believable, but also the habeas trial court who viewed the video and concluded, "he came across candid and at ease. There was no motivation for him to lie." A review of the video tape does not lead us to a contrary conclusion.

**10.** Under the same rationale, Lien's claim that Holgerson's failure to interview witnesses who arrived shortly after the accident was deficient and prejudiced him is equally unpersuasive. At the habeas trial there was testimony that both Lien and West came to rest on the driver's side with West's upper extremities in approximate alignment with the steering wheel. At the time of the roll-over accident, none of the Blazer's occupants were restrained. Predictably, at the habeas trial there was conflicting expert testimony as to who was driving the Blazer. Lien has not sustained his burden of proof in showing that had Holgerson interviewed every witness his plea recommendation would have changed.

2. The direct testimony of Adam Dailey that Lien was driving. No other witness including Lien would testify to the contrary. While there were minor inconsistencies in Dailey's descriptions of the accident, he consistently told investigating officers near the time of the accident that Lien was the driver. The video taped interview of Dailey which Holgerson studied at length led Holgerson to conclude Dailey was credible and could not be broken on the stand. The habeas trial court viewed this tape and agreed finding, "[Dailey] came across as candid and at ease. There was not motivation for him to lie." The sole contrary witness was Lien's father who claimed Dailey admitted to him Dailey could not remember who was driving. Being the father of the defendant, this evidence was obviously open to attack by the State on the grounds of bias;

3. The direct testimony of two other individuals who told Holgerson they "had seen [Lien] sitting behind the steering wheel in the Country Club [before] the accident." Thus with Dailey, three persons with no bias or motive to fabricate could put Lien behind the wheel of his own vehicle just prior to the accident; [11]

4. Lien admitted to Holgerson with one exception that when Lien had been drinking, "he didn't allow others to drive his vehicle." Further, the "one exception" occurred between a year to 18 months prior to the accident;

5. Evidence would be presented to the jury that the intoxicated Lien had been consuming alcohol in very substantial amounts and marijuana prior to the accident and the minors who were with him had also been drinking which would not

endear Lien to jurors who disprove of these illegal acts;

6. An expert (Lofgren) for Lien would obviously be subject to attack that he was being paid for his testimony while the State's eye witnesses were not and that the expert had not been at the accident scene. In fact, expert Lofgren at his habeas testimony failed to indicate that he had personally interviewed Dailey or any of the witnesses to the accident.[12] Given all of the above, Lofgren's conclusion that, "[t]here's nothing that supports Mr. Lien as being the driver" is questionable at best.

[¶ 24.] Holgerson's decision not to hire an expert before trial was influenced by Lien's instructions to attempt to get a suspended imposition. *See Strickland,* 466 U.S. at 691, 104 S.Ct. at 2052, 80 L.Ed.2d at 698 (counsel's actions can be "determined or substantially influenced" by defendant's instructions and statements). If Lien proceeded to trial he faced a maximum of 15 years and a $15,000 fine, or both, on the vehicular homicide charge and a year in the county jail and a thousand dollar fine or both on the possession of marijuana charge.

[¶ 25.] The only pertinent references to the timing and specifics of the plea is found in a colloquy between Holgerson and the State at Habeas:

I [Holgerson] discussed with [Lien] the plea proposal. I think his father was present for perhaps 60 to 70 percent of the meetings that [Lien] had in my office and maybe not, maybe 50 to 60 percent.... But his father was aware that a proposal—there was a consensus, if you will, that if we got to the stage—we meaning the defense team and the defendant—where the State was prepared to recommend a suspended imp, then we would take that....

---

11. This testimony was never challenged by Lien at the habeas proceeding either by cross-examination or other witnesses.

12. Holgerson's view of the limited effect that expert testimony would have on a jury is in accordance with our holdings on its evidentiary value:

We begin analysis of this issue from the long-accepted premise that the purpose of expert testimony is to assist the jury as the trier of fact and not to supplant it. This state is not a trial-

by-expert jurisdiction. The value of the opinion of an expert witness is no better than the facts upon which it is based. It cannot rise above its foundation and proves nothing if its factual basis is not true. It may prove little if only partially true. The credibility of witnesses and the evidentiary value of their testimony falls solely within the province of the jury. *Bridge v. Karl's Inc.,* 538 N.W.2d 521, 525 (S.D. 1995) (citations omitted).

While it is not evident exactly when the plea agreement was reached with the State, it appears from the contents of the record that Lien had several discussions with Holgerson concerning the plea. This falls well short of Lien's burden to establish his claim that the plea agreement was not made until the day set for trial and thus at that point, Holgerson should have already retained an expert in expectation of trial. *Johnson; Loop;* and *Two Eagle, supra.*

[¶ 26.] We do not require defense counsel to retain experts to complete a full investigation before recommending a plea to his client. Such a blanket assumption would run counter to the purpose of plea bargaining. Under the facts and circumstances of this case Holgerson's decision not to hire an expert was reasonable.[13]

[¶ 27.] Lien also claims that Holgerson's failure to show Lien the Prairie Lakes Hospital medical reports constitutes ineffective assistance of counsel. Factually, this claim was dismissed by the habeas trial court who found Holgerson had discussed the contents of the documents "in depth" with Lien. This aside, the Prairie Lakes reports showed that Lien's blood alcohol level was .40%. This unlikely result indicates that the test performed by Prairie Lakes was flawed. Neither Holgerson nor the State relied upon the Prairie Lakes report. Instead, the more reliable results appear to have been obtained through the State Health Laboratory which indicated a blood alcohol level of .174% and the presence of THC.[14] Lien has failed to show that the Prairie Lakes report is of sufficient exculpatory value so as to undermine the confidence in the reliability of his plea. *Cf. Hill,* 474 U.S. at 59, 106 S.Ct. at 370, 88 L.Ed.2d at 210 (prejudice may be found through a prediction as to whether "the evidence likely would have changed the outcome of a trial").

[¶ 28.] With the benefit of perfect hindsight, Holgerson testified that he may have done some things different while representing Lien. However, there is nothing in the record indicating that Holgerson would have altered his plea recommendation. Furthermore, even if Holgerson had conducted the type of investigation that Lien believes he should have, the evidence would not have likely changed the outcome of a trial. Had they proceeded to trial the outcome of the trial would have been a conviction with Lien facing up to 16 years imprisonment and substantial fines.[15]

[¶ 29.] **2. Lien's guilty plea was voluntary, knowing, and intelligent.**

[¶ 30.] With it being determined that Holgerson's representation was not deficient, Lien's claim that his guilty plea was entered

---

13. The dissent states that it was "incredible" for the habeas court to "excuse" Holgerson's failure to hire an expert by concluding in part that the results of the test may have provided corroboration for Dailey's version of the facts. Rather than being "incredible," the habeas court was correct. Pursuant to SDCL 23A–13–13 the State was entitled to the results of this test no matter what its conclusion. In fact, rather than this being a "hindsight" justification as claimed by the dissent, the State had already filed such a motion on November 20, 1995 only five days after Lien had filed and served his discovery motion on the State. Providing the State with potential expert testimony that it was Lien that was driving, coupled with all of the other evidence possessed by the State, would have made Lien's legal position which was found by the habeas trial court to be "a very tenuous position," more tenuous than it already was.

14. Lien also alleges that the Prairie Lakes Hospital test show he was negative for THC. The State Health Laboratory tests indicate Lien was positive for THC. It is important to note that the State did not allege that marijuana had any influence on Lien's driving of the Blazer. The State did recommend that the sentencing court consider marijuana *possession, not consumption,* at the time of the accident.

15. The dissent charges that Holgerson was constitutionally ineffective as he made a "decision not to investigate the theory that Lien was not the driver...." As the above analysis makes clear, Holgerson did exactly the contrary before obtaining the plea agreement result sought by Lien. The habeas trial court concluded that Lien's real complaint was:

> The reality is that Lien entered into a plea agreement where he received a very promising sentencing recommendation. Now, that the court sentenced him more severely than he wished or expected, he regrets his agreement.

involuntarily as a result of ineffective assistance is substantially weakened.[16]

[¶ 31.] As we stated in *Hopfinger*, this Court will look at the "totality of the circumstances" in determining if a guilty plea was voluntary, knowing and intelligent. 511 N.W.2d at 847–48. Lien relies upon State v. Wahle:

> Where the record shows that 'circumstances as they existed at the time of the guilty plea, *judged by objective standards*, reasonably justified his mistaken impression,' a defendant must be held to have entered his plea without full knowledge of the consequences and involuntarily.

521 N.W.2d 134 (S.D.1994) (quoting *United States v. Crusco*, 536 F.2d 21, 24–25 (3rd Cir.1976) (citations omitted) (emphasis original)). Lien's reliance upon *Wahle* is misplaced because the defendants in *Wahle* and *Crusco* claimed they should be allowed to withdraw their guilty pleas because they misunderstood the possible sentences they faced. Lien does not contend he did not understand the possible sentence.

[¶ 32.] In fact, the Statement of Defendant's Constitutional Rights and Waiver of Rights by Plea of Guilty correctly specified

the maximum possible sentence for vehicular homicide as fifteen years.[17] Lien informed both the sentencing and habeas courts that Holgerson explained the alternatives of not accepting the State's plea proposal. At the time Lien entered his guilty plea he was aware of the State's evidence against him, including the inconsistencies in Dailey's version of the accident[18] and the maximum possible sentence.[19] The court also carefully and thoroughly described the constitutional rights Lien would be waiving. *See Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). Furthermore, Lien was not under the influence of medication or drugs at the time he entered his plea. Lien entered his guilty plea voluntarily and with "full knowledge of the consequences." *Wahle*, 521 N.W.2d at 137.[20]

[¶ 33.] **3. Whether Lien has sustained his burden of proof in a claim that the prosecution failed to disclose exculpatory evidence in violation of due process?**

[¶ 34.] "[B]efore beginning a *Brady* analysis to determine whether or not specific evidence must be disclosed to [the defendant] by the prosecution, we must de-

16. We must note that in *State v. Lohnes*, 344 N.W.2d 686 (S.D.1984), this Court focused on the defendant's "reasonable expectations from the plea bargain" in determining whether he should have been allowed to withdraw his guilty plea. Lien bargained for and received the State's recommendation of a suspended imposition of sentence after becoming fully aware that the trial court was not bound by a plea agreement.

17. Lien signed a Statement of Defendant's Constitutional Rights and Waiver of Rights by Plea of Guilty on November 29, 1995. Paragraph 15 of the statement states:

> I am fully satisfied with the efforts of my defense counsel ... and his advice in handling this case, including, but not limited to, the potential defenses to each charge against me. *After explaining these alternatives to me*, my attorney told me that the final decision was mine, and he gave me sufficient time in which to make the decision. My decision, as I have stated, is to enter a plea of guilty.

(Emphasis added). At the plea proceedings the trial court took great pains to ensure Lien understood the Statement and Waiver he had signed. At the habeas proceeding Lien also agreed that Holgerson explained his alternatives.

18. See *United States v. Dalman*, 994 F.2d 537 (8thCir.1993) (defendant's performance during plea hearing inconsistent with his after-the-fact claim of involuntariness of guilty plea).

19. A more "stringent standard" is applied to withdraw a guilty plea after sentence has been imposed "to prevent a defendant from testing the weight of potential punishment, and then withdrawing the plea if he finds the sentence unexpectedly severe." *Lohnes*, 344 N.W.2d at 687–88.

20. At oral argument before this Court, Lien for the first time attempted to argue that the State did not in good faith comply with its plea bargain to urge the trial court to grant a suspended imposition. As this was not raised to the habeas trial court, nor briefed to this Court, it is waived. Beyond this procedural default, a fair reading of the record shows the State did comply with its agreement and was asking for some type of punishment within the confines of SDCL 23A–27–13 and 23A–27–18.1 which allows the trial court to order 180 days in the county jail as a condition of a suspended imposition.

termine that the evidence was not disclosed." *Ashker v. Solem,* 457 N.W.2d 473, 478 (S.D. 1990).[21]

▆▆▆ [¶ 35.] During the August 1995 grand jury proceedings a grand juror asked the State whether it was "definitely determined that ... Lien was the driver of the vehicle at the time of the accident, *through testimony?*" The State responded "through [Daily's] testimony, we are going by that, yeah." Lien contends that it was improper for the State to rely on Dailey's testimony and further that the State should have disclosed any exculpatory evidence at this time. To the contrary, the grand jury need only hear the prosecution's side of an investigation and need not be presented with exculpatory evidence in the possession of the prosecutor. *United States v. Williams,* 504 U.S. 36, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992). A defendant has no right to have evidence favorable to him or her presented to a grand jury, just as he has no right to testify himself before such a body. *Id.; see also United States v. Isgro,* 974 F.2d 1091, 1096 (9thCir.1992) ("In fairly expansive language, *Williams* clearly rejects the idea that there exists a right to such 'fair' or 'objective' grand jury deliberations"). Thus, under the circumstances, it was not error for the grand jury to solely rely upon the Dailey's testimony.

▆▆▆ · [¶ 36.] Lien also alleges that the first officers on the scene, Officers Seim and McMahon, failed to officially report that West was found on the driver's side of the vehicle in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). When the officers arrived, Lien had already been removed from the vehicle by bystanders and Dailey was sitting on a nearby lawn. The only person under the vehicle was West. Officer McMahon stated in his accident report that he "found the arm of ... West sticking out from underneath the vehicle." Officer Seim's report does not elaborate on the location of West upon arrival. Lien contends that the failure of the officers to specifically state that West's arm was sticking out of the *driver's* side of the vehicle was "inexcusable" and justifies relief. Perhaps the better procedure would have been for the officers to more carefully document the exact location of West upon their arrival.[22] It is true that West's upper extremities were located on the driver's side of the Blazer. Perhaps the officers failed to detail the location of West since there were no other persons in the vehicle to judge in relation to West's body. However, under the circumstances, the officers lack of specificity does not rise to withholding of exculpatory evidence. Our review of the record fails to reveal any evidence the State suppressed any evidence or deceived Lien in any respect.

[¶ 37.] Affirmed.

[¶ 38.] MILLER, C.J., and KONENKAMP, J., concur.

[¶ 39.] SABERS and AMUNDSON, JJ., dissent in part and concur in part.

SABERS, Justice (dissenting in part and concurring in part).

[¶ 40.] **1. DEFECTIVE PERFORMANCE**

[¶ 41.] I dissent.[23] Defense counsel's decision not to investigate the theory that Lien was not the driver, under these circumstances, constitutes ineffective assistance of counsel and we should reverse. *See Foster v. Lockhart,* 9 F.3d 722, 726 (8thCir.1993):

---

**21.** If it is found that evidence was not disclosed and if the following four questions can be answered affirmatively, the defendant's due process rights have been violated and a new trial must be granted:
 1. Was the defense unaware of the evidence?
 2. Is the evidence favorable to the defense?
 3. Is the evidence material to the defense?
 4. Did the defense make a request for the evidence?
*Black,* 1997 SD 22 at ¶ 16, 560 N.W.2d at 548 (citations omitted).

**22.** All of the Blazer's passengers had been thrown to the driver's side.

**23.** I agree with the majority opinion that the failure of the police to officially report the location of West's body does not give rise to a *Brady* violation; however, I do not join in the speculation of the possible reasons why this information was omitted. *See supra* ¶ 36.

Reasonable performance of counsel includes an adequate investigation of facts, consideration of viable theories, and development of evidence to support those theories. An attorney must make a reasonable investigation in preparing a case or make a reasonable decision not to conduct a particular investigation.

(Citation omitted). Here, counsel did not conduct "an adequate investigation of facts" upon which he could base a "reasonable decision" whether to defend at trial or plea bargain.

[¶ 42.] Counsel gave a number of excuses for not pursuing the "other driver" theory. First, he stated his concern that producing an accident reconstructionist would merely pit one expert against another. Counsel never even consulted an accident reconstruction expert, nor did he have any idea what the State's expert might conclude, so it would be impossible for his "decision" to be an informed judgment.[24]

Before an attorney can make a reasonable strategic choice against pursuing a certain line of investigation, the attorney must obtain the facts needed to make that decision. An attorney's "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."

*Id.* (quoting *Kenley v. Armontrout,* 937 F.2d 1298, 1304 (8thCir.), *cert. denied,* 502 U.S. 964, 112 S.Ct. 431, 116 L.Ed.2d 450 (1991); *Strickland v. Washington,* 466 U.S. 668, 690–91, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674, 695 (1984)). Neither the State nor the majority opinion offer any authority which states that

a decision not to pursue a theory is reasonable when counsel has not even investigated its viability. *Cf. Foster,* 9 F.3d at 726:

Although we generally give great deference to an attorney's *informed strategic choices,* we closely scrutinize an attorney's preparatory activities.

(Emphasis added) (citing *Chambers v. Armontrout,* 907 F.2d 825, 831, 835 (8thCir.) (en banc), *cert. denied,* 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 331 (1990)).

[¶ 43.] Holgerson also claims he was concerned with "real dangers in trying a technical case in front of a Codington County jury[.]" As noted, Holgerson did not know to what an expert might testify, so his fear the testimony would be too "technical" is unfounded. Furthermore, a review of the testimony provided by both Lien's and State's experts for the habeas proceeding demonstrates that testimony is relatively clear and not confusing or highly technical. In fact, the defense expert, Myron Lofgren testified:

In my opinion, I wish all of [the] cases that I worked where determining a driver was a question, that it was this straightforward. And it's straightforward simply because it's a forward collision with only a 90–degree rotation and half a rollover.

Even if we were to agree that the testimony might be confusing to a jury, Holgerson did not have *any* facts, let alone *adequate* facts, to conclude that an expert's opinion would be too "technical" for a Codington County jury.

[¶ 44.] There is nothing in the record to explain why Holgerson never consulted an accident reconstruction expert. In fact, at

---

**24.** It is incredible that the habeas court excuses counsel's failure to consult an expert by stating:

One must also remember, that at the time, attorney Holgerson did not know what an accident reconstruction would disclose. It very well may have provided collaboration [sic] for Dailey.

*See Thomas v. Lockhart,* 738 F.2d 304, 309 (8thCir.1984) ("[J]ust as hindsight cannot be used to condemn counsel's performance, it cannot be used to justify it.").

The majority opinion also claims at ¶ 4:

The record indicates that Holgerson had experience in defending vehicular homicide cases and had successfully defended his most recent client on this kind of criminal proceeding.

In fact, Holgerson had *one* prior vehicular homicide case; interestingly, in that case he consulted an accident reconstruction expert prior to advising his client to accept a plea bargain. Regardless,

It is important to stress that the issue in ineffectiveness cases is not a lawyer's culpability, but rather his client's constitutional rights. Even the best attorney may render ineffective assistance, often for reasons totally extraneous to his or her ability.

*St. Cloud v. Leapley,* 521 N.W.2d 118, 128 n. 7 (S.D. 1994) (quoting *United States v. DeCoster,* 487 F.2d 1197, 1202 n. 21 (D.C.Cir.1973)).

the arraignment, Holgerson actually requested an extra trial day for accident reconstruction testimony. Since Lien did not instruct Holgerson to abandon that strategy, and since an expert was not consulted, Holgerson's attempts at rationalization at the habeas hearing are questionable.

[¶ 45.] The majority opinion attempts to place the blame on Lien for failing to "provide Holgerson with any information casting doubt upon the identity of the driver of his Blazer which would require him to conduct a more stringent investigation." ¶ 18.[25] In fact, Holgerson concedes that Lien's father informed Holgerson that Dailey admitted that he could not remember who was driving.

[¶ 46.] Additionally, even though Lien does not remember the accident, there were numerous pieces of evidence which should have prompted Holgerson to investigate whether Lien was driving:

1) There is a photograph showing the deceased with his arm extended from the driver's seat of the Blazer;

2) Lien was extricated from the *rear* driver's side;

3) Lien told hospital admissions personnel that he was an unrestrained *passenger* in the vehicle; and

4) as stated above, the information relayed by Lien's father.

Holgerson did not need Lien to provide information which cast doubt as to driver identity when all the information was available and accessible from other sources and witnesses never interviewed by Holgerson. *See Benson v. United States,* 552 F.2d 223, 225 (8thCir.), *cert. denied,* 434 U.S. 851, 98 S.Ct. 164, 54 L.Ed.2d 120 (1977) ("Ordinarily, a reasonably competent attorney conducts an in-depth investigation of the case, including independent interviewing of witnesses[.]").

[¶ 47.] Holgerson also testified that Adam Dailey's testimony that Lien was driving appeared "unimpeachable." *Counsel never even interviewed Dailey.* Dailey's taped statement and his grand jury testimony reveal inconsistencies in his account of the accident. Furthermore, defense counsel testified that Lien's father reported a conversation in which Dailey told him that Lien was *not* driving. A prior inconsistent statement is a basic impeachment tool. *See* SDCL 19–14–25 (FedREvid 613(b)); *State v. Brings Plenty,* 459 N.W.2d 390, 402–03 (S.D.1990); *State v. Thomas,* 381 N.W.2d 232, 238–39 (S.D.1986); *see also Driscoll v. Delo,* 71 F.3d 701, 710 (8thCir.1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 273, 136 L.Ed.2d 196 (1996):

> [W]e conclude that there is no objectively reasonable basis on which competent defense counsel could justify a decision not to [use prior inconsistent statements to] impeach a state's eyewitness whose testimony, as the district court points out, took on such remarkable detail and clarity over time.

As the majority opinion suggests, Dailey had no apparent motive to lie. However, he may not have been able to remember who was driving, and his use of marijuana and alcohol that night could have been used to impeach him by casting doubt on his ability to recall the accident.

[¶ 48.] Based on the above, Lien has met the first requirement of *Strickland,* i.e., that "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. The cases relied upon in the majority opinion do not detract from this conclusion. For

---

**25.** It was actually Holgerson who withheld information from Lien. Dailey's videotaped statement, Lien's hospital records, and the photographs of the crash scene were never shown to Lien or his family. *Cf. Aliberti v. Solem,* 428 N.W.2d 638, 643 (S.D.1988) (Sabers, J., dissenting):

> How can it be said that there was a knowing, intelligent, and voluntary waiver of [right to jury trial] when Aliberti's counsel only provided him with half the information necessary to make such a waiver? Aliberti was never advised by his attorney on the full picture—the pros and the cons of waiving this constitutional

right. His consent was a product of loss of hope, created by counsel.

> Aliberti's trial counsel failed to meet his responsibility to consult in a meaningful manner with Aliberti on this important decision. Strickland, supra. A fair reading of this record reveals that counsel's representation with respect to the question of jury trial waiver was so ineffective and casual that it evidences a manifest usurpation of Aliberti's constitutional rights.

(Emphasis in original).

example, in *Fast Horse v. Leapley*, 521 N.W.2d 102 (S.D.1994), the petitioner complained counsel was ineffective for not calling several witnesses. As it turned out, most of their testimony was actually not helpful to his defense. Additionally, his attorney explained his trial strategy, which was logical and accounted for his not calling certain witnesses. *Id.* at 104–05. This case is clearly distinguishable. Failure to even consult with an accident reconstruction expert under these circumstances cannot, by any stretch of the imagination, be accurately referred to as "strategy" or "tactics."

[¶ 49.] As for *St. Cloud v. Leapley*, this court determined defense counsel's failure to investigate constituted ineffective assistance:

> [T]he right of an accused to the services of an attorney envisages that his attorney will investigate and consider possible defenses. Failure on the part of counsel to conduct the necessary investigation into the facts may result in such prejudice as to justify the granting of relief. Our review of this record causes us to agree that St. Cloud's defense counsel should have made an investigation into whether or not a warrant (or similar document) existed. As pointed out by St. Cloud, his defense counsel did travel to Lower Brule to interview potential witnesses; it would have taken little additional effort to examine the tribal court file. The failure to make this investigation was not the result of reasonable professional judgment, thus satisfying the first prong of *Strickland*.

521 N.W.2d 118, 127–28 (S.D.1994) (concluding that St. Cloud failed to establish prejudice under the second prong) (citations, internal quotations & footnotes omitted). Likewise, it would have taken little additional effort [26] here to investigate the "other driver" theory and the failure to do so was not the

result of reasonable professional judgment, thus satisfying the first prong of *Strickland*.

## [¶ 50.] 2. PREJUDICE

[¶ 51.] Whether these deficiencies in counsel's representation prejudiced Lien depends upon whether

> counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words … the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial…. [W]here the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial.

*Hill v. Lockhart*, 474 U.S. 52, 59, 106 S.Ct. 366, 370, 88 L.Ed.2d 203, 210 (1985).

[¶ 52.] Here, Lien met his burden to show that if he had been armed with the information that counsel failed to gather or share with him, Lien would have insisted on going to trial.[27] The majority opinion excuses counsel's failure to consult an expert because of "Lien's instructions to attempt to get a suspended imposition." ¶ 24. *But see State v. Pieschke*, 262 N.W.2d 40, 46 (S.D.1978):

> The right of an accused to the services of legal counsel envisages that his attorney will investigate and consider possible defenses and, if none, other procedures, and exercise his good faith judgment thereon.

---

**26.** Holgerson testified that cost was not a factor preventing him from consulting an expert.

**27.** At ¶ 25, the majority opinion states:
> [I]t appears from the contents of the record that Lien had several discussions with Holgerson concerning the plea. This falls well short of Lien's burden to establish his claim that the plea agreement was not made until the day set for trial and thus at that point, Holgerson should have already retained an expert in ex-

pectation of trial. *Johnson; Loop; Two Eagle, supra.*

These cases cited do not state that the petitioner must show "that the plea agreement was not made until the day set for trial." In fact, plea bargains were not even at issue in these cases. See *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *Loop v. Class*, 1996 SD 107, 554 N.W.2d 189; *Two Eagle v. Leapley*, 522 N.W.2d 765 (S.D.1994).

*It does not contemplate that an accused may take charge of the case after an attorney has been appointed, or dictate its course . . . .*

(Emphasis added) (citation omitted). Furthermore, the majority opinion's assertion— "We do not require defense counsel to retain experts to complete a full investigation before recommending a plea to his client"—is made without supporting authority. *See Eldridge v. Atkins*, 665 F.2d 228, 232 (8thCir.1981), *cert. denied*, 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 168 (1982):

It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to guilt and degree of guilt or penalty. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's *admissions or statements to the lawyer of facts constituting guilt or his stated desire to plead guilty.*

(Emphasis added) (citations omitted).

[¶ 53.] Lien is not required to show that he would have been acquitted, but must only undermine confidence in the trial's likely outcome. *Hill*, 474 U.S. at 59, 106 S.Ct. at 370, 88 L.Ed.2d at 210; *Foster*, 9 F.3d at 726. He met this burden. Lofgren testified unequivocally, "There's nothing that supports Mr. Lien as being the driver." State's expert, on the other hand, conceded, "I guess I could argue both ways as to both drivers. . . . [T]he physical evidence in this situation is such that you could make an argument both ways and taking what evidence would correspond to that driver being behind the wheel. . . . I don't feel that there's enough physical evidence that can place either one behind the wheel with any degree of certainty." This refutes the majority opinion's assertion that the expert testimony corroborated Dailey's version of events. *Supra* n. 13. Significantly, Lofgren based his opinion on his view of the site, the vehicle, and the photographs. State's expert *never* examined the vehicle and did not visit the accident site until the day of his testimony—facts which, if elicited on cross-examination, could only bolster Lofgren's opinion that Lien was not the driver:

The value of an expert's opinion is no better than the facts upon which it is based. Such testimony proves nothing if its factual basis is not true and may prove little if only partially true.

*LDL Cattle Co., Inc. v. Guetter*, 1996 SD 22, ¶ 22, 544 N.W.2d 523, 528 (citations & internal quotations omitted).

[¶ 54.] The majority opinion fails to explain away the reality that strong defense expert testimony, coupled with effective tools with which to impeach Daily and State's expert creates a reasonable probability that the jury would have had reasonable doubt as to whether Lien was the driver that night. That is enough to undermine confidence in the trial's likely outcome. Therefore, Lien has established prejudice under the second prong of *Strickland*, 466 U.S. at 695, 104 S.Ct. at 2068–69, 80 L.Ed.2d at 698 (defendant is prejudiced by counsel's unprofessional conduct when "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."); *see also Driscoll*, 71 F.3d at 706:

Absent competent counsel, ready and able to subject the prosecution's case to the crucible of meaningful adversarial testing, there can be no guarantee that the adversarial system will function properly to produce just and reliable results.

(Quoting *Lockhart v. Fretwell*, 506 U.S. 364, 377, 113 S.Ct. 838, 847, 122 L.Ed.2d 180, 194 (1993) (Stevens, J., dissenting) (other citation & internal quotation omitted)).

[¶ 55.] In light of all the above, it is clear that Lien has established ineffective assistance of counsel under Strickland and we should reverse and remand for a plea or a trial.

[¶ 56.] AMUNDSON, J., joins this special writing.